**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

K.C., an individual,
Plaintiff,

v. Civil Action No.: ________________

G6 HOSPITALITY, LLC;
G6 HOSPITALITY IP, LLC; JURY TRIAL DEMANDED
G6 HOSPITALITY PROPERTY, LLC;
G6 HOSPITALITY PURCHASING, LLC;
and MOTEL 6 OPERATING, L.P.,

Defendants.

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff K.C., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

**INTRODUCTION**

1. This is a civil action for damages brought pursuant to the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was induced by force, fraud, and coercion to engage in commercial sex acts at the Motel 6 located at 1501 Fitzgerald Drive, Pinole, California 94564 (the "Subject Hotel"), from January 2018 through and inclusive of December 2018.

3. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, and Motel 6 Operating, L.P. (collectively, the "G6 Defendants") own, operate, and control the Motel 6 brand and the systems, standards, policies, and programs under which Motel 6 branded properties are operated. Upon information and belief, and as further alleged below, the G6 Defendants also held the possessory interest in, and directly

owned, operated or co-operated, controlled, and/or managed, the Subject Hotel itself throughout the period during which Plaintiff was trafficked.

4. Defendant G6 Hospitality Property, LLC held the ground leasehold estate in the real property comprising the Subject Hotel. Upon information and belief, Motel 6 Operating, L.P. assigned that leasehold to it as of October 1, 2012, and it encumbered that leasehold by deeds of trust recorded in Contra Costa County, California on August 9, 2017 and September 14, 2017. Upon information and belief, G6 Hospitality Property, LLC held that leasehold estate in, and operated, controlled, and managed, the Subject Hotel from January 2018 through and inclusive of December 2018, the period during which Plaintiff was trafficked there.

5. Upon information and belief, the Subject Hotel was at all times during the period of Plaintiff's trafficking a corporate-operated Motel 6 property.

6. Upon information and belief, the Subject Hotel was not operated by a third-party franchisee at any time during the period of Plaintiff's trafficking.

7. Upon information and belief, if the Subject Hotel was operated by any entity other than the G6 Defendants at any time during the period of Plaintiff’s trafficking, the identity of that entity is known to Defendants and is not known to Plaintiff.

8. The persons employed at the Subject Hotel as front desk staff, housekeeping staff, maintenance staff, and management were, at all relevant times, the employees and agents of the G6 Defendants, acting within the course and scope of that employment and agency, and their acts, omissions, and knowledge are attributable to the G6 Defendants.

9. Section 1595 of the TVPRA provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1), a criminal statute; (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2), a criminal statute; and (3) a beneficiary

claim against a civil defendant benefiting from and receiving anything of value from participation in a venture which that person knew or should have known was engaged in sex trafficking. The subject lawsuit is applicable, in part, to prong three, i.e., a beneficiary claim against civil defendants.

## PARTIES

10. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, Plaintiff proceeds by her initials to protect the privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

11. Plaintiff K.C. is a resident of California and was born in 1999.

12. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

13. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

14. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

15. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

16. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Texas and in the Eastern District of Texas. The policies, protocols, standards, training, systems, and operational directives that governed the Subject Hotel, and the failures in those policies, protocols, standards, training, systems, and directives alleged throughout this Complaint, were adopted, maintained, administered, and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas, within this District.

19. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Each of the G6 Defendants is therefore a resident of the Eastern District of Texas.

20. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1). Each of the G6 Defendants maintains its principal place of business in the Eastern District of Texas and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). All Defendants are accordingly residents of the State of Texas, and all reside in this District.

21. The operation of the Subject Hotel was directed, controlled, and administered from the Eastern District of Texas because:

(a) the G6 Defendants dictated the policies related to safety, security, human trafficking, and hotel operations applicable at the Subject Hotel from their principal place of business in the Eastern District of Texas;

(b) upon information and belief, the Subject Hotel was required to report to the G6 Defendants in the Eastern District of Texas all incidents involving safety, security,

public relations, or serious injury to persons or property occurring at or involving the Subject Hotel, including incidents involving sex trafficking victims like K.C.;

(c) upon information and belief, the staff and management of the Subject Hotel were required to complete training created, controlled, and maintained by the G6 Defendants and administered from their principal place of business in the Eastern District of Texas;

(d) upon information and belief, the Subject Hotel was required to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

(e) upon information and belief, reservation information for rooms at the Subject Hotel passed through a system operated and managed by the G6 Defendants from their principal place of business in Texas;

(f) upon information and belief, payment information for rooms at the Subject Hotel passed through a system operated and managed by the G6 Defendants in Texas;

(g) upon information and belief, the property management system in use at the Subject Hotel was linked to the corporate network and data center of the G6 Defendants, through which room reservations were received and payment transactions for those rooms were processed;

(h) the day-to-day operations of the Subject Hotel were dictated, controlled, and influenced by policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas;

(i) upon information and belief, the revenue generated by the rental of rooms at the Subject Hotel, including the rooms used for the trafficking of K.C., was collected,

accounted for, and remitted to the G6 Defendants at their principal place of business in the Eastern District of Texas; and

(j) upon information and belief, the recordkeeping and reporting concerning the operation of the Subject Hotel, including records of guest complaints, incidents, and online reviews, was maintained and analyzed by the G6 Defendants at their principal place of business in the Eastern District of Texas.

## FACTS

**I. K.C. was a Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.**

22. From January 2018 through and inclusive of December 2018, Plaintiff K.C. was trafficked at the Subject Hotel by her trafficker. Under the control of her trafficker, K.C. was induced by force, fraud, and coercion to engage in commercial sex acts at the Subject Hotel.

23. Plaintiff was trafficked by her trafficker, a male individual known to Plaintiff as "Alex," who operated a commercial sex trafficking enterprise at the Subject Hotel.

24. The trafficker advertised Plaintiff for commercial sex on the internet, including upon the classified advertising website Backpage.com, and directed the sex buyers who responded to those advertisements to the rooms he rented at the Subject Hotel for the trafficking of K.C.

25. In order to induce K.C. by force, fraud, and coercion to engage in sex with sex buyers at the Subject Hotel:

(a) the trafficker physically abused, beat, and assaulted K.C., leaving visible bruising and marks on her body which were readily observable by the staff of the Subject Hotel;

(b) the trafficker verbally abused, berated, and screamed at K.C.;

(c) the trafficker instilled in K.C. the fear that she would suffer serious harm if his demands were not complied with.

26. K.C. was compelled to engage in commercial sex acts with numerous sex buyers at the Subject Hotel.

27. The rooms used for the trafficking of K.C. at the Subject Hotel were rented in the name of the trafficker or at the direction of the trafficker, and were rented on a recurring basis, on repeated occasions, from January 2018 through and inclusive of December 2018.

28. Sex buyers responding to the trafficker's online advertisements proceeded directly to the rooms rented for the trafficking of K.C., arriving at and departing from those rooms throughout the day and night in a steady stream, across the walkways, corridors, stairways, and parking areas of the Subject Hotel and in the view of its staff.

29. K.C. was present and observable in and about the common areas of the Subject Hotel, including its walkways, corridors, and parking areas, dressed in scant and revealing clothing, in the view of the staff of the Subject Hotel.

30. K.C. consumed alcohol at the Subject Hotel and was, on repeated occasions, visibly impaired by alcohol in and about the Subject Hotel and in the presence of its staff.

31. Staff of the Subject Hotel observed, or should have observed, visible bruising and marks on K.C.'s body inflicted upon her by her trafficker.

32. The rooms used for the trafficking of K.C. at the Subject Hotel contained, and their waste receptacles contained, an inordinate number of used condoms, together with empty and partially consumed bottles of alcohol left in open view upon the furnishings of the rooms, all of which were visible to the housekeeping staff of the Subject Hotel.

33. The physical, behavioral, and psychological effects of sex trafficking on its victims are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel including effects on K.C.'s appearance, dress, demeanor, movements throughout the hotel, her visible bruising and marks, her visible impairment, and her interactions with her trafficker, hotel staff, sex buyers, and others. Observing these effects provided Defendants with notice that K.C. was being continually subjected to coercion, control, and exploitation.

**II. Sex Trafficking in the Hotel Industry Is a Well-Known and Pervasive Problem.**

34. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the G6 Defendants knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of K.C.

35. The signs of sex trafficking in a hotel environment follow well-established patterns and can be detected by appropriately trained staff.

36. Numerous governmental agencies and non-governmental organizations engaged in combatting sex trafficking, including the United States Department of Homeland Security through its Blue Campaign, the National Center for Missing and Exploited Children, and ECPAT, have developed and published recommended policies, procedures, and training materials directed specifically to the hotel and lodging industry for the recognition of, and the response to, the signs of sex trafficking. Those materials were publicly available, and were available to Defendants, at all times relevant to this Complaint.

37. All Defendants were aware or should have been aware of recognized signs of sex trafficking when operating, controlling, and/or managing the Subject Hotel or the aspects of its operation over which they respectively retained control, when enacting and enforcing policies and

procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

38. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to the signs of sex trafficking.

**III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.**

39. Defendants have long been on notice of the pervasive problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has also long been on notice of sex trafficking occurring at Motel 6 properties including the Subject Hotel.

40. A Motel 6 property in the Sylmar neighborhood of Los Angeles, California became such a hub for human trafficking and other criminal activity that the City of Los Angeles brought a public nuisance action in November 2016 naming G6 Hospitality Property, LLC, which Defendants paid $250,000 to settle in August 2017 — approximately five months before Plaintiff was first trafficked at the Subject Hotel. G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

41. The settlement required security measures at that property for a period of three years, including the installation of surveillance cameras, the retention of security guards, guest identification and registration requirements, and the posting of human trafficking notices. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

**IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.**

42. G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there.

43. Publicly posted guest reviews of the Subject Hotel, appearing on Google and on Yelp, described open commercial sex activity and open drug activity occurring at the Subject Hotel. Each of the reviews set forth below was publicly available on the internet, and each predated the trafficking of K.C. at the Subject Hotel.

44. The G6 Defendants generate, receive, monitor, and analyze reports of guest complaints and of online reviews concerning their branded properties, including the Subject Hotel, as further set forth below.

45. The content of the reviews set forth below was therefore known to Defendants, or in the exercise of reasonable care would have been known to Defendants, prior to and during the period in which K.C. was trafficked at the Subject Hotel.

46. Those publicly posted reviews of the Subject Hotel include the following:

(a) A review posted to Yelp in January 2013, stating: "There were hookers and Johns, coming and going all night long."; and

(b) A review posted to Google approximately eleven years prior to the filing of this Complaint, describing the Subject Hotel as a "Good hooker and crank head motel."

47. The review set forth at subparagraph (a) above did not merely describe the general character of the Subject Hotel. It described the specific pattern by which K.C. was later trafficked there: sex buyers arriving at and departing from the guest rooms of the Subject Hotel throughout the night.

48. Upon information and belief, Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on:

(a) the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

(b) the fact that hotel staff observed, or should have observed, the obvious signs of the trafficking of Plaintiff, including the visible bruising and marks on her body, her visible impairment, her presence in the common areas of the Subject Hotel in scant and revealing clothing, and the steady stream of male visitors proceeding directly to and from the room rented for her trafficking;

(c) the fact that the rooms used for the trafficking of Plaintiff were rented in the name of the trafficker on a recurring basis; and

(d) the publicly posted reviews of the Subject Hotel described above.

**V. Defendants knew K.C. was being trafficked at the Subject Hotel because of the obvious signs of her trafficking.**

49. During the period that K.C. was trafficked at the Subject Hotel, there were signs obvious to hotel staff and management that she was being trafficked, including:

(a) Steady foot traffic of sex buyers to and from the rooms rented for the trafficking of K.C., across the walkways, corridors, stairways, and parking areas of the Subject Hotel;

(b) K.C. was present in the common areas of the Subject Hotel, in the direct view of hotel staff, while dressed in scant and revealing clothing;

(c) The rooms used for the trafficking were rented on a recurring basis in the name of a man who often did not himself occupy them alone and who was not the person seen coming and going from them;

(d) K.C. was regularly seen by hotel staff in and about the Subject Hotel with visible bruising and marks on her body;

(e) K.C. was regularly seen by hotel staff in and about the Subject Hotel while visibly impaired by alcohol;

(f) An inordinate number of used condoms were placed in the waste receptacles of the rooms used for the trafficking, and empty and partially consumed bottles of alcohol were left in open view upon the furnishings of those rooms, all in the direct view of housekeeping staff;

(g) The trafficking of K.C. at the Subject Hotel continued on a recurring basis over an extended period; and

(h) Hotel staff observed the foregoing red flags, yet took no action to stop the trafficking, report it, or intervene.

50. Hotel staff and management observed, or should have observed, the foregoing obvious signs of sex trafficking including items set forth in the preceding paragraph.

51. K.C. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to K.C. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel.

52. Based upon information and belief, multiple employees at the Subject Hotel, including management-level employees and front desk and housekeeping staff, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

53. Upon information and belief, the Subject Hotel was equipped with surveillance cameras positioned throughout the property, including in and about its corridors, walkways, entrances, and parking areas. Upon information and belief, the images captured by those cameras were displayed upon monitors located at the front desk of the Subject Hotel, which were monitored, or were required to be monitored, by the staff, management, and ownership of the Subject Hotel. The red flags of the trafficking of K.C. set forth above, including the steady foot traffic of sex buyers to and from the rooms rented for her trafficking, occurred within the view of those cameras.

54. As such, Defendants knew or should have known that K.C. was being trafficked at the Subject Hotel.

55. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of sex trafficking specifically because they included observable signs of force, coercion, and control over K.C. — including the visible bruising and marks upon her body, the trafficker's exclusive control over the rental of the rooms she occupied, and her visible impairment. These signs, individually and collectively, provided Defendants with notice not only of sex trafficking activity generally at the Subject Hotel, but specifically that K.C. was being subjected to trafficking through force, fraud, and coercion.

**VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of K.C.**

56. Defendants had both actual and constructive knowledge of the trafficking of K.C. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

57. The rooms used for the trafficking of K.C. were rented and/or renewed in the name of the trafficker, or at the direction of the trafficker, on a repeated, recurring basis from January 2018 through and inclusive of December 2018.

58. Defendants rented rooms to individuals it knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

59. The G6 Defendants, through the staff of the Subject Hotel, rented the rooms used for the trafficking of K.C., collected payment for those rooms, and interacted face-to-face with K.C. and her trafficker on a regular and repeated basis. These were not passive observations of trafficking from a distance; the G6 Defendants were directly involved in the commercial transactions that provided the venue for the trafficking of K.C.

60. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms rented that were used for sex trafficking, including as to the Plaintiff, in violation of the TVPRA from January 2018 through and inclusive of December 2018.

61. The rooms at the subject hotel that were used for the sex trafficking of the Plaintiff were rented in the name of the trafficker. Discovery will reveal additional facts concerning the manner in which the trafficker and those acting at his direction booked rooms at the subject hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

(a) the identification, if any, that staff of Defendants required at the time of each booking or renewal;

(b) the records maintained by Defendants of the payments made for the rooms so rented.

62. Defendants allowed the trafficker and those acting at his direction on the subject premises to continue to rent and pay for rooms at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

63. The allegations of this Complaint directed to the owner, operator, and manager of the Subject Hotel are directed to the G6 Defendants, which upon information and belief held the possessory interest in and operated, controlled, and managed the Subject Hotel throughout the period of K.C.'s trafficking. The allegations directed to the G6 Defendants in their brand, systems, and standards capacity are likewise directed to those Defendants throughout that entire period.

64. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, the G6 Defendants continued renting rooms used to sexually exploit Plaintiff.

65. The G6 Defendants knew or should have known that K.C. was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue for her exploitation.

66. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued to control, participate in, and derive revenue from the rental of rooms at the Subject Hotel, including the rooms used to sexually exploit victims, including K.C.

67. G6 knew or should have known that K.C. was being trafficked and, despite this, benefited from continued association with her trafficker by providing hotel rooms and related services used for her exploitation.

68. If G6 had exercised reasonable diligence in the areas of the operation of the Subject Hotel over which it retained control, G6 would have prevented the Subject Hotel from being used

to facilitate widespread and ongoing sex trafficking, including the trafficking of K.C. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of K.C.

**VII. Defendants knowingly benefited from participation in a venture that they knew or should have known was engaged in sex trafficking.**

69. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with the trafficker and with one another.

70. The repeated rental transactions between the trafficker (and those acting at his direction) and the Subject Hotel which occurred during the time that Plaintiff was trafficked at the subject hotel were colored by overt indicators of sex trafficking — including the steady foot traffic of sex buyers to and from the rooms throughout the day and night, K.C.'s presence in the common areas of the subject hotel in scant and revealing clothing, the visible bruising and marks upon her body, her visible impairment by alcohol, the recurring rentals themselves in the name of a man who was not the sole occupant of the rooms, an inordinate number of used condoms in the room waste receptacles, the alcohol bottles left in open view in those rooms — such that said Defendant knew, or should have known, that Defendant was renting rooms to, and facilitating, individuals engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

71. A venture existed between the trafficker and the G6 Defendants at the subject hotel premises by means of rooms repeatedly rented for the trafficking, which rooms Defendants knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

72. A venture also existed among the G6 Defendants themselves, pursuant to which the Subject Hotel was operated, branded, and controlled.

73. Relative to the subject hotel, a continuous business relationship existed between the G6 Defendants and the trafficker's sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the trafficker and individuals it knew or should have known were involved in sex trafficking on the premises, in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

74. Relative to the subject hotel, a continuous business relationship existed between the G6 Defendants, through the brand systems, standards, and programs under which the Subject Hotel was operated, and the trafficker's sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the trafficker and individuals they knew or should have known were involved in sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

75. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting rooms used for the trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue. Upon information and belief, the gross room revenue generated at the Subject Hotel was collected for the account of the G6 Defendants and remitted to them. The G6 Defendants therefore received a direct financial benefit from each room rented at the Subject Hotel, including each room rented for the trafficking of K.C.

## VIII. The Staff of the Subject Hotel Acted as Employees and Agents of the G6 Defendants, and the G6 Defendants Controlled Its Operation.

76. The G6 Defendants are vicariously liable for the acts, omissions, and knowledge of the management and staff of the Subject Hotel.

77. The G6 Defendants imposed detailed standards and requirements governing the operation of the Subject Hotel through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations.

78. Upon information and belief, and consistent with the standard practice of the hospitality industry, the G6 Defendants set exacting brand standards governing the operation of the Subject Hotel, reaching such matters as the temperature at which coffee is to be served, the number of pillows to be placed upon the beds, the forms of payment to be accepted, and when, where, and how guests are to be greeted. The G6 Defendants further supplied the signage displayed on and in front of the building and required the Motel 6 brand and marks to be displayed throughout the property, including upon the stationery placed in the guest rooms and upon the uniforms worn by the staff stationed at the front desk, so that a guest arriving at the Subject Hotel would expect an experience consistent with the standards of the Motel 6 brand. The average guest does not perceive any distinction among the several G6 entities behind the property. The brand supplies the property its identity, and the G6 Defendants hold themselves out to the public as the owners and operators of the Subject Hotel, as in fact they were. The right of the G6 Defendants to enforce their brand standards, including their safety and security standards, was not merely their right but their responsibility.

79. Upon information and belief, G6 exercised and reserved the right to exercise control over the day-to-day operation of the Subject Hotel, including:

(a) requiring the management of the Subject Hotel to participate in mandatory training programs covering all aspects of hotel operations;

(b) controlling training content and methods for hotel staff;

(c) designating approved vendors and prohibiting purchases from non-approved sources;

(d) requiring use of specific technology, hardware, software, and property management systems;

(e) setting required staffing levels;

(f) establishing detailed job descriptions and dictating which positions must perform which tasks;

(g) setting requirements for hiring, overseeing discipline, and termination decisions;

(h) controlling channels for guest complaints and directly participating in responses;

(i) generating reports and analysis of guest complaints and online reviews;

(j) requiring use of a Guest Relations Application owned and operated by G6;

(k) regularly auditing books and records;

(l) conducting frequent and unscheduled inspections;

(m) retaining the right to require corrective action plans and to remove or replace the management of the Subject Hotel;

(n) controlling all marketing and prohibiting unauthorized online presence;

(o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations;

(p) requiring all hotel staff to complete training created, controlled, and maintained by the G6 Defendants through an online learning platform that the G6 Defendants owned and operated, and retaining sole discretion to determine whether such training had been satisfactorily completed;

(q) providing benefits for the employees of the Subject Hotel;

(r) requiring the use of a customer relationship management program maintained and operated by the G6 Defendants; and

(s) requiring that the property management system in use at the Subject Hotel be linked to the corporate network and data center of the G6 Defendants, through which room reservations were received and payment transactions for those rooms were processed.

80. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including:

(a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties;

(b) retaining control over when its branded hotels would share information with law enforcement and over when law enforcement would be contacted about suspected criminal activity at its branded hotels;

(c) creating a reporting hotline for hotel staff to report suspected human trafficking and determining when issues should be escalated;

(d) retaining control over determining which hotels needed additional training based on high risk of trafficking;

(e) retaining control to terminate staff based on the response to human trafficking;

(f) retaining control over all training on how to spot and prevent human trafficking;

(g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents;

(h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking;

(i) setting, supervising, and enforcing detailed policies and protocols for housekeeping services at the Subject Hotel, including how frequently guest rooms were required to be entered, how staff were required to respond when a guest declined entry to a room, and the steps by which guest safety issues were to be monitored through housekeeping services;

(j) setting, supervising, and enforcing the policies and protocols governing the response of the staff and management of the Subject Hotel to the presence of non-registered visitors in and about its guest rooms; and

(k) collecting, maintaining, and analyzing detailed data regarding housekeeping services at the Subject Hotel, including data that would reveal patterns consistent with human trafficking.

81. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

(a) controlling all details of the guest reservation, check-in, and payment processes;

(b) directly making reservations and accepting payment through a central reservation system without requiring the approval of the management of the Subject Hotel;

(c) establishing and maintaining a brand-wide guest rewards and loyalty program;

(d) controlling room rates, required discounts, mandatory fees, and rewards programs;

(e) controlling and restricting the ability of the management and staff of the Subject Hotel to refuse or cancel a reservation;

(f) establishing detailed policies and protocols dictating, step by step, everything that occurred from the time a guest arrived at the Subject Hotel until the guest entered a guest room, including required payment methods, identification requirements, the number of guests permitted in each room and whether information was to be collected for each guest, and what questions hotel staff were and were not to ask;

(g) collecting, retaining, monitoring, and analyzing detailed data about every guest;

(h) exercising and retaining the right to exercise control over virtually all aspects of room reservations and payment;

(i) establishing and maintaining a brand-wide "do not rent" system, setting all policies governing the use of that system, and dictating the day-to-day details of reservations at the Subject Hotel through those policies; and

(j) listing the Subject Hotel in the Global Distribution System and in other online travel agency databases, maintaining brand-wide toll-free reservation telephone numbers through which rooms at the Subject Hotel were booked, and supplying and controlling the revenue management tools used at the Subject Hotel.

**IX. G6 Defendants are jointly responsible for the trafficking of K.C.**

82. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

83. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, the leasehold interest in the Subject Hotel, the brand and

marks under which it operated, the systems through which its rooms were reserved and paid for, and the revenue it generated were held and shared among the G6 Defendants as a single integrated enterprise, and each is therefore vicariously liable for the violations of the others.

**X. Causation.**

84. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to K.C.

85. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to K.C. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA**

86. K.C. incorporates all other allegations.

**COUNT I. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)**

87. K.C. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is entitled to bring a civil action against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

88. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including K.C.'s trafficker, even though Defendants knew or should have known that this trafficker was engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C. § 1595(a).

89. Through the acts and omissions described throughout this Complaint, the G6 Defendants received a financial benefit from participating in a venture with one another regarding the operation of the Subject Hotel even though the G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

90. Defendants' participation in these ventures combined with the trafficker's conduct, and the other unlawful acts and omissions alleged in this Complaint, to cause K.C. to suffer substantial physical and psychological injuries and other damages because of being trafficked at the Subject Hotel.

**COUNT II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)**

91. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

92. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

93. The management and staff of the Subject Hotel acted as the employees and actual agents of the G6 Defendants, within the course and scope of that employment and agency, in operating the Subject Hotel.

94. Through the acts and omissions described throughout this Complaint, the G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods by which the Subject Hotel was operated.

95. The G6 Defendants are vicariously liable for the TVPRA violations of the management and staff of the Subject Hotel and of one another.

**DAMAGES**

96. As a direct and proximate result of Defendants' conduct, K.C. has suffered and will continue to suffer substantial damages.

97. Defendants' involvement and failure to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate cause of the injuries and damages sustained by K.C. in this case including, but not limited to, being the victim of sex trafficking when at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being induced to engage in commercial sex with numerous sex buyers while being trafficked, and while simultaneously being under fear of harm if she did not comply, being subjected to repeated physical abuse and violence — including beatings leaving visible bruising and marks — being subjected to sustained verbal abuse and degradation, as well as all residual injuries suffered by PTSD.

98. K.C. being sex trafficked at the Subject Hotel was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to personal injuries including the horror of being a victim of sex trafficking as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked. This trauma led to depression, anxiety, and PTSD, which in turn affects daily functioning, and for which K.C. has required and continues to require psychiatric and psychological care, including counseling and prescribed medication.

99. As a consequence of being sex trafficked at the Subject Hotel, K.C. suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. § 1591.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above cause of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Lost earnings and loss of earning capacity, past and future;

(g) Necessary past and future medical expenses;

(h) Life care expenses;

(i) Physical impairment;

(j) Disgorgement of profits obtained through unjust enrichment;

(k) Restitution;

(l) All damages allowable under the TVPRA;

(m) Attorneys' fees as allowed by law;

(n) Punitive damages with respect to each cause of action;

(o) Costs of this action;

(p) Prejudgment and all other interest recoverable; and

(q) Such other and further relief to which K.C. may, in law or in equity, show herself to be justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: July 29, 2026

Respectfully submitted,

/s/ Jason Byrd
Jason Byrd
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph D. Janis, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
cmakowsky@douglasandlondon.com

Attorneys for Plaintiff